NOT FOR PUBLICATION                                              CLOSED

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
                                              :
KELTIC FINANCIAL PARTNERS, LP,                :
                                              :
                  Plaintiff,                  :         Civ. No. 05-4324 (JAP)
                                              :
        v.                                    :
                                              :         **OPINION**
GERALD KROVATIN et al.,                       :
                                              :
                  Defendants.                 :
_____       :

PISANO, District Judge.

        Plaintiff Keltic Financial Partners, LP ("Keltic") brought this action against Defendants

Gerald Krovatin, Esq. and Krovatin & Associates (together "Krovatin"), Sheldon Witt, Esq.

("Witt"), Margaret Gatti, Esq. and Gatti & Associates (together "Gatti"), and the law firm of

Pitney Hardin LLP ("Pitney Hardin") alleging professional negligence by all Defendants arising

out of legal services that they performed in connection with Keltic's loan to International

Helicopters, Inc. ("IHI") and Aviators, Ltd. ("Aviators").  Presently before the Court is each

Defendant's Motion for Summary Judgment in Lieu of Answer to the Amended Complaint.  The

Court has jurisdiction pursuant to 28 U.S.C. § 1332.  For the reasons stated below, the Court

grants summary judgment in favor of Defendants.

## I.  BACKGROUND

        This action relates to legal services that Keltic received in connection with financing that

it extended to IHI and Aviators.  Keltic is a Delaware limited partnership with its principal place

of business in the State of New York.  It is an asset-based lender that specializes in financing

companies in transition, *i.e.*, companies that have difficulty obtaining loans from banks because the companies are experiencing financial problems.

In 1991, Daniel Malloy ("Malloy") and his wife Ellen Malloy (together "the Malloys") created IHI, a New Jersey corporation engaged in the sale and brokerage of aviation parts for commercial and military aircraft, primarily helicopters. Aviators, an affiliate of IHI, serves as a marketing agent/broker for the sale of helicopter and aircraft parts. In March 1998, Malloy was arrested and indicted by the United States Government for attempting to export U.S. Munitions list commodities to Iran through an intermediary in Singapore. Malloy pled guilty to charges that he violated the Arms Export Control Act and was sentenced to a twenty-eight month prison term, followed by three years of supervised release. The conditions of Malloy's supervised release prohibited him from employment or participation in the aviation business during that three-year period. As part of his sentence, Malloy was ordered to pay a fine of $750,000 and to forfeit the sum of $1,888,705 to the United States Government. To guarantee payment of the fine and forfeiture, the Malloys executed deeds of conveyance—which the United States Government held in escrow—covering real estate the Malloys owned in New Jersey, New York, and Florida.

On September 10, 1998, IHI filed a voluntary petition in bankruptcy. The bankruptcy court appointed a trustee and IHI continued to operate with Ellen Malloy serving as president and chief financial officer ("CFO"). As president and CFO, she engaged in several transactions involving the export of aircraft parts regulated by the United States Departments of State and Commerce after obtaining an International Traffic in Arms Regulations ("ITAR") license and other regulatory approvals required for each transaction.

On August 29, 2000, the United States Department of Commerce ("Commerce

Department") issued a denial order (the "Commerce Order") to Malloy forbidding him from, *inter alia*, participating directly or indirectly in the exporting, marketing, buying, selling, storing, or transporting of certain commodities, software, and technology subject to the Export Administration Regulations until the expiration of the order on December 13, 2007.  On February 25, 2002, the United States Department of State ("State Department") issued a debarment order (the "State Order") prohibiting Malloy from participating directly or indirectly in the export of certain defense articles until the expiration of the order on March 4, 2002.  Upon expiration of the State Order, Malloy could obtain reinstatement of his licensing privileges only upon application to State Department.

After his release from prison in or around May 2002, Malloy and his wife approached Keltic for a loan for the purpose of (1) paying the forfeiture amount that Malloy owed to the United States Government, (2) paying IHI's creditors and facilitating its emergence from bankruptcy, and (3) providing working capital to IHI and Aviators.  In connection with their loan request, the Malloys represented to Keltic that IHI and Aviators were in the business of selling and exporting helicopter parts based on the State Department's issuance of an ITAR license to Ellen Malloy.  The Malloys further represented that IHI and Aviators had secured significant orders and would quickly become profitable, demonstrated by revenue projections reflecting sales in excess of $500,000 per month after IHI's emergence from bankruptcy.  Additionally, the Malloys assured Keltic that there were no legal barriers to the successful implementation of their business plan despite the appearance of government and regulatory constraints.

Based in part on those representations and Keltic's expectation that IHI and Aviators would be able to continue selling and exporting helicopter parts through Ellen Malloy and her

ITAR license, Keltic decided, on July 17, 2002, to extend to IHI and Aviators a $3.75 million line of credit, with the Malloys serving as guarantors of the loan.  Keltic conditioned its loan proposal on compliance by IHI and Aviators with all applicable laws and regulations and on a favorable resolution of the restrictions placed on Malloy as a result of the criminal proceedings.

The parties negotiated and revised the loan documents throughout August of 2002 and scheduled a September 9, 2002 closing.  During these negotiations and at closing, Defendant Witt represented IHI, Aviators, and the Malloys while Defendant Pitney Hardin represented Keltic.  At the September 9, 2002 closing, Defendant Krovatin, who was Malloy's attorney in the criminal case, and whom Keltic describes as regulatory counsel to the borrowers (IHI and Aviators) and guarantors (the Malloys), informed Keltic of the Commerce Order.  Krovatin did not mention the State Order.  Keltic, previously unaware of the Commerce Order, postponed the closing and instructed Pitney Hardin to conduct an investigation into the Commerce Order, its impact on IHI's ability to generate sales, and Keltic's potential exposure to fines and penalties.  Keltic rescheduled the closing for December 16, 2002, pending, *inter alia*, its receipt of opinion letters from the Malloys' counsel, and assurances from Pitney Hardin that the proposed transaction did not violate any laws or regulations and that Malloys were fully and legally capable of fulfilling their expected roles in IHI and Aviators.

Two days after the aborted closing, Krovatin forwarded a letter to Pitney Hardin in response to a request for his opinion on the issue of Malloy's role in IHI and Aviators in light of the Commerce Order and other orders arising out of Malloy's criminal conviction (the "Criminal Order") and a related civil order (the "Civil Order").  In the letter, Krovatin expressed his understanding that Aviators would secure all necessary export licenses required by United States

4

law through the State Department and that Malloy would not be participating in any exporting or

shipping functions.  Further, Krovatin opined that, based on his understanding of Malloy's role,

he (1) would not be in violation of the Commerce Order, the Criminal Order, or the Civil Order,

(2) would not own any interest in Aviators and would not participate in the management or

operations of that company, and (3) would not be involved in any business that required him to

secure any export licenses required by United States law.

Also on September 11, 2002, Ellen Malloy advised Keltic via letter that the Commerce

Order expired in March 2002.  Thereafter, Keltic instructed Pitney to investigate the Commerce

Order issue more thoroughly and informed the Malloys that, in order for Keltic to proceed with

the transaction, it required a modification of the Commerce Order and of the restrictions

stemming from Malloy's criminal conviction and the conditions of his supervised release.

On November 5, 2002, Krovatin sent a letter to the Commerce Department requesting a

modification of and/or an advisory opinion on the Commerce Order.  Krovatin specifically

referenced the State Order in the letter and included it as an attachment.  He stated incorrectly,

however, that Malloy was no longer debarred by the State Order.  Although the State Order had

expired, Malloy remained ineligible to obtain an export license.  In any event, Krovatin provided

the letter and a copy of the State Order to the United States Bankruptcy Court, to Pitney Hardin,

and to all counsel of record in the IHI bankruptcy proceeding.  On December 6, 2002, the

Commerce Department denied the Malloys' request for a modification to the Commerce Order,

making Keltic reluctant to proceed with the transaction.  Aware of Keltic's reluctance, the

Malloys proposed that the parties retain a third-party regulatory expert with knowledge of the

export business to serve as a compliance officer.  On December 9, 2002, Keltic's counsel

forwarded to Krovatin an email stating that:

> Keltic has determined that obtaining an expert legal opinion will not overcome the concerns and potential risks associated with a violation of the Commerce Department Order. . . .  The breadth of the Commerce Order and the complexity of the Commerce Department regulations make it problematic for any lender to provide financing for your clients.

(Muller Cert., Ex. L).  On December 11, 2002, however, Keltic resolved to proceed with the loan transaction on the condition that Defendant Gatti be retained as an independent compliance officer to ensure that IHI, Aviators, and the Malloys did not violate any laws or regulations.

On December 16, 2002, the date of closing, Gatti issued an expert legal opinion discussing the financing arrangements that Keltic proposed and the effects of the Commerce Order on those financing arrangements.  Gatti limited her opinion, however, to whether Keltic's loan to IHI, Aviators, and the Malloys would put Keltic at risk of violating the Commerce Order:

> Specifically, my opinion gives consideration to and evaluates the potential violations of the Commerce Department denial order that could be attributed to Keltic . . . by virtue of its proposed working capital loan to . . .  IHI . . . and Aviators . . . given that:  (1) each Borrower was formerly owned and managed by Daniel A. Malloy who is currently subject to a U.S. Commerce Department Denial Order; and (2) Daniel A. Malloy as a 'denied party' will nonetheless be permitted to actively participate in the Borrowers' domestic sales and marketing functions.  Additionally, my opinion seeks to provide guidance to Keltic with regard to how it can avoid the occurrence and/or attribution of denial order violations and remain in full compliance with the Daniel A. Malloy denial order terms.

(French Cert., Ex. A).  Gatti's opinion letter included, *inter alia*, an analysis of the Commerce Order and recommended a number of actions for Keltic to take to ensure that it did not violate the Commerce Order or expose itself to liability in the event of a violation on the part IHI, Aviators, or the Malloys.  Gatti's letter did not discuss the State Order.  Also on December 16, 2002, Defendant Witt issued an opinion letter which stated, *inter alia*, that in Witt's opinion, IHI,

6

Aviators, and the Malloys were in compliance with all applicable laws, rules, regulations and other legal requirements, the violation of which would materially impair their right and ability to carry on their operations.  On December 16, 2002, Keltic and IHI, Aviators, and the Malloys closed on the loan, which provided for a maximum borrowing capacity of $3.55 million.  IHI, Aviators, and the Malloys agreed to secure the loan with all of their receivables, inventory, equipment and general intangibles, which had an estimated orderly liquidation value of $9,240,100.  Further, the Malloys executed personal guarantees and granted Keltic a security interest in property located in East Hampton, New York, and Florida.  With the funds received from Keltic, IHI emerged from bankruptcy and Malloy paid the amounts he owed to the United States Government.

According to Keltic, IHI and Aviators defaulted on loan as of May 1, 2003 by, *inter alia*, exceeding the maximum borrowing capacity, failing to comply with financial reporting requirements, and failing to meet their monthly sales projections in part due to Ellen Malloy's inability to obtain the necessary governmental licenses for the sale of inventory involving exports to foreign entities.  A primary reason behind Ellen Malloy's inability to obtain the necessary licenses was her husband's continued employment with Aviators, the marketing agent for IHI's helicopter parts.  Malloy's employment with Aviators plainly contradicted his representation—made prior to closing—that he would not participate in the management or operations of Aviators.

In May 2003, Keltic brought suit in the Superior Court of New Jersey, Bergen County (the "Bergen County litigation") against the Malloys, as guarantors of the loan, for repayment of the loan proceeds.  On June 1, 2003, IHI and Aviators filed a second bankruptcy petition.  In

7

January 2006, Keltic agreed to settle all of its claims against IHI, Aviators, and the Malloys for $3.5 million.  In September 2005, Keltic commenced the instant action alleging that Witt, Krovatin, Gatti, and Pitney Hardin committed legal malpractice arising out of the legal services that each provided in connection with the loan transaction.

Keltic asserts a claim of legal malpractice against Defendant Witt alleging that Witt (1) formed the incorrect opinion that the State Order did not prohibit Keltic's transaction with the Malloys; (2) failed to disclose that the State Order barred the loan transaction; and (3) formed the incorrect opinion that the loan transaction was permissible under the Commerce Order.  Keltic alleges similar claims against Krovatin.  Specifically, Keltic contends that Krovatin committed professional negligence by (1) failing to disclose the existence of the State Order; (2) forming the incorrect opinion that Keltic's transaction with the Malloys was permissible under both the State Order and the Commerce Order; and (3) other unspecified acts of failing to protect Keltic's interest and reveal material facts about the Malloys.[1]

Keltic alleges that Gatti committed professional negligence by (1) forming the incorrect opinion that neither the Commerce Order nor the State Order prohibited the loan transaction; and (2) failing to disclose that Keltic's decision to extend financing to Malloy, who was subject to debarment, would expose Keltic to government sanction.  Finally, Keltic contends that Pitney Hardin committed legal malpractice by (1) forming the incorrect opinion that the State Order had expired and that it was not necessary for Pitney Hardin to review the order; (2) forming the

---

[1] Keltic's Complaint contains additional claims against Krovatin arising out of alleged violations of the Rules of Professional Conduct.  Ethical violations cannot support a private action for damages against an attorney.  *See Baxt v. Liloia*, 155 N.J. 190, 714 A.2d 271, 274-75 (1998).  Therefore, the Court finds that these claims fail as a matter of law.

incorrect opinion that the Commerce Order did not prohibit the loan transaction; (3) failing to contact regulators to determine the true compliance status of IHI, Aviators, and the Malloys; and (4) failing to obtain testimony from the Malloys regarding the State Order during the Bergen County litigation.[2]

Defendants move for summary judgment as to all of the claims.  Defendants contend that Keltic's claims fail as a matter of law because the Malloys' fraudulent conduct and default on the loan—not any alleged malpractice on the part of Defendants—caused Keltic's loss.  Further, Defendants argue that they are entitled to summary judgment on all of Keltic's claims pursuant to the principle announced in *Puder v. Buechel*, 183 N.J. 428, 874 A.2d 534, 543 (2005) that "a client should not be permitted to settle a case for less than it is worth . . . and then seek to recoup the difference in a malpractice action against [the] attorney."  Additionally, Defendants Witt and Krovatin argue that they cannot be found liable to Keltic for professional negligence because they did not owe a duty to Keltic, a non-client.  Lastly, Defendant Pitney Hardin argues that it was not responsible for issuing an opinion regarding the Commerce and State Orders and, thus, cannot be found liable for any alleged failure to review the orders or advise Keltic as to their impact on the transaction.

As explained below, the Court finds that *Puder* does not apply to the situation presented here.  Nonetheless, the Court grants summary judgment in favor of the Defendants because New Jersey's entire controversy doctrine bars Keltic from pursuing its claims against Defendants.  Moreover, even if the entire controversy doctrine did not apply, Keltic's claims would still fail

---

[2] As Pitney Hardin points out, it was not counsel of record in the Bergen County litigation at the time in which Keltic could have obtained deposition testimony from the Malloys. Therefore, the Court finds this claim to be wholly without merit.

because Krovatin and Witt owed no duty to Keltic, a non-client, and Defendants' alleged

negligence was not a substantial factor in causing the harm that Keltic suffered.

## II.  DISCUSSION

### A.  Standard of Review under Federal Rule of Civil Procedure 56

Summary judgment is appropriate under Federal Rule of Civil Procedure 56© "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with

affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving

party is entitled to judgment as a matter of law."  The substantive law identifies which facts are

critical or "material."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On a summary judgment motion, the moving party must show, first, that no genuine issue

of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then

shifts to the non-moving party to present evidence that a genuine fact issue compels a trial.  *Id.* at

324.  The non-moving party must offer specific facts that establish a genuine issue of material

fact, not just "some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v.

Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

The Court must consider all facts and their logical inferences in the light most favorable

to the non-moving party.  *Pollock v. American Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir.

1986).  The Court shall not "weigh the evidence and determine the truth of the matter," but need

determine only whether a genuine issue necessitates a trial.  *Anderson*, 477 U.S. at 249.  If the

non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine

issue of material fact exists, then the Court must grant summary judgment.  *Big Apple BMW v.

BMW of North America*, 974 F.2d 1358, 1363 (3d Cir. 1992).

The Third Circuit has instructed district courts to "give a party opposing summary judgment an adequate opportunity to obtain discovery." *Radich v. Goode*, 886 F.2d 1391, 1393 (3d Cir. 1989). Where the party opposing summary judgment has not been afforded the opportunity to discover facts in the possession of the moving party, a court should grant a continuance of the summary judgment proceedings "almost as a matter of course." *Sames v. Gable*, 732 F.2d 49, 51 (3d Cir. 1984) (internal quotation omitted). Additionally, pursuant to Rule 56(f) of the Federal Rules of Civil Procedure, district courts have discretion "to defer ruling on a summary judgment motion when a party opposing summary judgment files an affidavit indicating that it needs more discovery." *Radich*, 886 F.2d at 1393. A Rule 56(f) affidavit must set forth a party's need for discovery, "what material facts it hopes to uncover and why it has not previously discovered the information." *Id.* at 1393-94. Although Keltic has filed a Rule 56(f) affidavit, the Court will not grant a continuance of the summary judgment proceedings to allow for discovery because the Court finds that the entire controversy doctrine bars Keltic's claims against Defendants.

### B. *Puder Does Not Apply*

All Defendants contend that Keltic's claims fail as a matter of law in light of the principle announced in *Puder v. Buechel*, 183 N.J. 428, 874 A.2d 534, 543 (2005)[3] that "a client should

---

[3] In that case, the plaintiff brought action against Puder, whom she had retained in a matrimonial action, for professional negligence arising out of Puder's negotiation of a settlement agreement. Before placing that agreement on the record, the plaintiff discharged Puder and retained new counsel to proceed with the matrimonial action. The plaintiff's husband argued that the first settlement was valid and enforceable, but, while that issue was still pending, the parties agreed to a second settlement agreement negotiated by plaintiff's new attorney. Though the terms of the second settlement agreement were very similar to the original agreement that Puder negotiated, the plaintiff testified that the second agreement was a "fair compromise of the issues," "acceptable," and "a voluntary compromise." *Id.* at 434. After the parties placed the

11

not be permitted to settle a case for less than it is worth . . . and then seek to recoup the difference in a malpractice action against [the] attorney." In the Court's view, however, *Puder* is distinguishable from the instant case. *Puder* stands for the proposition that a client, after entering into a settlement agreement for less than a particular claim is purportedly worth, may not attempt to recoup the difference by bringing suit against his or her attorney on the theory that the attorney's malpractice resulted in a less favorable settlement. Unlike the plaintiff in *Puder*, Keltic does not contend that Defendants' alleged malpractice caused it to accept an insufficient settlement. Indeed, the malpractice alleged here does not even arise out of legal services provided during the Bergen County litigation or Keltic's settlement of that matter. Instead, Keltic contends that Defendants failed to provide full and accurate legal advice in connection with Keltic's decision to execute a loan transaction with the Malloys. There is nothing in *Puder* that would prevent Keltic from asserting malpractice claims that do not arise out of legal services provided in connection with the Bergen County litigation. Thus, Defendants' reliance on *Puder* is misplaced.

Further, following Defendants' argument out to its logical conclusion reveals that Defendants' position is inconsistent with the policy underlying the *Puder* decision. Assuming that the Malloys would not have settled the Bergen County litigation for the full amount that Keltic sought, Defendants proposed reading of *Puder* would encourage Keltic—and other

---

second settlement on the record in the matrimonial action, the court granted Puder's motion for summary judgment in the legal malpractice action. The court reasoned that the plaintiff waived her right to sue Puder for malpractice because the plaintiff entered the second settlement before there was a determination as to the validity of the first settlement agreement. The Supreme Court of New Jersey agreed, holding the plaintiff was "bound by her representation to the trial court that the [second] settlement was 'acceptable' and 'fair.'" *Id.* at 535.

similarly situated plaintiffs—to forego settlement and try its case to verdict.  Such a result would

subvert one of the primary rationales for the *Puder* decision:  New Jersey's public policy in favor

of settlements.  *See id.* at 539-40 (noting that "[s]ettlement ranks high in [the] public policy" of

New Jersey and that New Jersey courts "have actively encouraged litigants to settle their

disputes").  Accordingly, the Court finds that *Puder* does not preclude Keltic from asserting legal

malpractice claims against Defendants.

### C.  The Entire Controversy Doctrine Bars Keltic's Professional Negligence Suit

Although *Puder* does not apply to the instant case, the Court finds that the entire

controversy doctrine bars Keltic's professional negligence claims against Defendants.  "The

'entire controversy doctrine seeks to assure that all aspects of a legal dispute occur in a single

lawsuit.'"  *Fornarotto v. American Waterworks Co., Inc.*, 144 F.3d 276, 278 (3d Cir. 1998)

(quoting *Olds v. Donnelly*, 150 N.J. 424, 696 A.2d 633, 637 (1997)).[4]  The purpose of the

doctrine is "(1) to encourage the comprehensive and conclusive determination of a legal

controversy; (2) to achieve party fairness . . . and (3) to promote judicial economy and efficiency

by avoiding fragmented, multiple and duplicative litigation."  *Venuto v. Witco Corp.*, 117 F.3d

754, 761 (3d Cir. 1997).  The Supreme Court of New Jersey has stated that application of the

entire controversy doctrine is proper when a commonality of core facts links distinct claims such

that the claims should be determined in one proceeding:

> In determining whether successive claims constitute one controversy for purposes
> of the [entire controversy] doctrine, the central consideration is whether the claims
> against the different parties arise from related facts or the same transaction or
> series of transactions.  It is the core set of facts that provides the link between

---

[4] The entire controversy doctrine is codified in Rule 4:30A of the New Jersey Rules of
Civil Procedure.

> distinct claims against the same or different parties and triggers the requirement
> that they be determined in one proceeding.

*DiTrolio v. Antiles*, 142 N.J. 253, 662 A.2d 494, 502 (1995) (internal citations omitted).  Claims

are related for the purposes of the entire controversy doctrine if there is a likelihood of additional

litigation after resolution of the initial action:

> The test for whether claims are "related" such that they must be brought in a
> single action under the New Jersey entire controversy doctrine . . . [is] as follows:
> if parties or persons will, after final judgment is entered, be likely to have to
> engage in additional litigation to conclusively dispose of their respective bundles
> of rights and liabilities that derive from a single transaction or related series of
> transactions, the omitted components of the dispute or controversy must be
> regarded as constituting an element of one mandatory unit of litigation.

*Fornarotto*, 144 F.3d at 279 (quoting *DiTrolio*, 662 A.2d at 502).

Here, Keltic's claims against Defendants arise out of the same series of transactions that

formed the basis for the Bergen County litigation against the Malloys:  the loan transaction and

subsequent breach of the loan agreement.  Both the Bergen County litigation and the instant

action involve issues related to the terms of the loan agreement, the ability of IHI, Aviators, and

the Malloys to perform their obligations under the loan, the truth of the representations that the

Malloys made to Defendants and Keltic, and the harm Keltic suffered due to the breach of the

loan agreement.  Thus, the Court is satisfied that the Bergen County litigation and the instant

action are two causes of action arising from the same transactional facts.  The Court recognizes

that the two causes of action implicate different legal issues:  contract formation and breach on

the one hand and negligence on the other hand.  It is the commonality of facts, however, not legal

issues that control application of the entire controversy doctrine.  *DiTrolio*, 662 A.2d at 504

("The entire controversy doctrine does not require commonality of legal issues.  Rather, the

14

determinative consideration is whether distinct claims are aspects of a single larger controversy because they arise from interrelated facts.").

Unlike cases in which the doctrine has been deemed inapplicable, the two sets of claims at issue here share a causal nexus.  In the Bergen County litigation, Keltic asserted that the conduct of IHI, Aviators, and the Malloys caused the harm flowing from the breach of the loan agreement.  Keltic now claims that Defendants' allegedly inadequate legal services also caused that very same harm.  In the Court's view, Keltic's theory that the two sets of defendants concurrently caused the harm and that each set of defendants is therefore responsible for Keltic's damages plainly demonstrates a significant causal and factual nexus between the claims. Moreover, the instant action is precisely the type of fragmented litigation that the entire controversy doctrine seeks to prevent.  Keltic was aware of its professional negligence claim prior to commencement of the Bergen County litigation.  Additionally, it was aware of the likelihood that it would "have to engage in additional litigation to conclusively dispose of the[] respective bundles of rights and liabilities deriv[ing] from . . . a related series of transactions": execution of the loan transaction and the borrowers' subsequent breach of the loan agreement. *Fornarotto*, 144 F.3d at 279 (quoting *DiTrolio*, 662 A.2d at 502).  Accordingly, this successive action is a "constituent component" of the Bergen County litigation.  *See id.* at 281 (stating that entire controversy doctrine applies where second suit is a "constituent component" of the first).

Although Keltic tried unsuccessfully to amend its complaint in the Bergen County litigation to include some of the claims at issue here, Keltic does not argue that the motion to amend represented an attempt to comply with the entire controversy doctrine.  Nor does Keltic contend that it would be unfair to bar its malpractice claims in light of its attempt to amend the

15

complaint.  Instead, Keltic argues that it would have been premature to include the malpractice claims in the Bergen County litigation because, in Keltic's view, those claims had not yet accrued.  According to Keltic, their claims against Defendants did not accrue until early 2006 "when it became obvious that Keltic would not be made whole by the Malloys, IHI, or Aviators." (Pltf's Br. at 21).  This contention, however, is belied by the fact that Keltic initiated the instant action in September 2005.  Therefore, Keltic should have included in the Bergen County litigation the claims it now raises against Defendants.

Keltic further argues that the fairness concerns that form a part of the entire controversy doctrine analysis weigh in favor of permitting this successive litigation to proceed.  *See Fornarotto*, 144 F.3d at 282 ("Despite the doctrine's apparent rigidity, New Jersey courts have clearly stated that it is not to be applied in a rigid manner divorced from concepts of equity and fairness.").  In the Court's view, however, principles of fairness support the invocation of the doctrine in this instance.  By not including Defendants in the Bergen County litigation, Keltic prevented Defendants from participating in the settlement of that case.  Defendants' absence from those settlement negotiations has resulted in prejudice because the apparent inadequacy of that settlement is Keltic's sole motivation for bringing suit against Defendants.  Defendants participation in the Bergen County litigation could have resulted in an entirely different outcome making this litigation unnecessary.  Further, implicit in Keltic's settlement with the Malloys—who were liable for the full amount of Keltic's damages—is that Keltic achieved a fair and acceptable award for the harm it suffered.  This Court fails to see how fairness requires a subsequent action for the same harm.

Keltic made a conscious decision not to pursue Defendants in the Bergen County

litigation, despite the factual commonality and causal nexus between its claims against the

Malloys and its claims against Defendants, all of which arose out the same series of transactions.

Additionally, Keltic made a conscious decision to settle the Bergen County litigation for what it

later determined to be an insufficient sum.  Keltic is now bound by those earlier decisions as the

Court, in its discretion, finds that Keltic's claims against Defendants are barred by the entire

controversy doctrine.  *Mystic Isle Development Corp. v. Perskie & Nehmad*, 142 N.J. 310, 662

A.2d 523, 529-30 (1995) ("[B]ecause the entire controversy doctrine is an equitable principle, its

applicability is left to judicial discretion based on the particular circumstances inherent in a given

case.").

Moreover, though not relevant to the Court's finding with respect to the entire

controversy doctrine, the Court notes that Defendants Krovatin and Witt owed no duty to Keltic,

a non-client.  Neither Defendant knew or should have known that Keltic would rely on its

opinions, particularly with respect the Commerce and State Orders, because Keltic was

represented by Pitney Hardin and had solicited an expert opinion regarding the Malloys'

regulatory status from Gatti.  *See Petrillo v. Bachenberg*, 139 N.J. 472, 655 A.2d 1354, 1359-60

(1995) ("[A]ttorneys may owe a duty of care to non-clients when the attorneys know, or should

know, that non-clients will rely on the attorney's representations and the non-clients are not too

remote from the attorneys to be entitled to protection.").  Thus, Keltic was "too remote" from

Krovatin and Witt "to be entitled to protection."  *Id.* at 1360 ("[T]he point is to cabin the

lawyer's duty, so the resulting obligation is fair to both lawyers and the public.").

Furthermore, Defendants' alleged negligence was not a substantial factor in causing

Keltic's harm.[5]  *See Conklin v. Hannoch Weisman*, 145 N.J. 395, 678 A.2d 1060, 1071-72

(noting that New Jersey courts employ the substantial factor test for causation in legal

malpractice cases).  It was the Malloys' fraudulent scheme—including the creation of false

revenue projections and Daniel Malloy's blatant failure to honor his earlier representations—and

the ultimate breach of the loan agreement that caused Keltic's harm.[6]  Thus, even if the entire

controversy doctrine did not bar Keltic from proceeding with its claims against Defendants, the

claims would still fail as a matter of law.

**CONCLUSION**

For the reasons expressed above, the Court hereby grants Defendants' motions for

summary judgment.  An appropriate order accompanies this opinion.


/s/ Joel A. Pisano_____
JOEL A. PISANO, U.S.D.J.

Dated:  March 29, 2007

---

[5] Plaintiff's causation argument is particularly weak with respect to its claims against Krovatin.  Krovatin issued an opinion in September 2002 and provided other counsel with the State Order in November 2002, *i.e.*, prior to the issuance of the Witt and Gatti opinions and prior to Keltic's request that Pitney Hardin investigate the regulatory issues surrounding the transaction.  Thus, even assuming that Krovatin committed professional negligence, the subsequent actions of Pitney Hardin, Witt, and Gatti superseded and purged any such negligence.

[6] Keltic's own Complaint alleges that the Malloys fraudulently induced Keltic to extend financing to IHI and Aviators, and that they committed bank fraud, wire fraud, mail fraud, obstruction of justice, perjury, and false swearing.  In addition to the false revenue projections, the Malloys created a sham business plan and failed to disclose their true regulatory status in order to obtain the loan from Keltic.